# PATRICK J. BRACKLEY

−ATTORNEY AT LAW −
233 BROADWAY, SUITE 2370
NEW YORK, NY 10279
TEL. (212) 334-3736

June 5, 2026

VIA ECF

The Honorable Glenn T. Suddaby, Sr. U.S.D.J.
Northern District of New York
James Hanley Federal Building, 11th Floor,
100 South Clinton Street,
Syracuse, New York 13261

  Re: United States v. Wenjian Zhuo 25 CR 222 (GTS)

Dear Judge Suddaby:

  I represent Wenjian Zhuo, who is scheduled to be sentenced at 10:30 a.m. on June 30, 2026, and I submit this letter to aid the Court in fashioning an appropriate sentence that is fair to both Mr. Zhuo and to the Government.  For the reasons set forth below, I respectfully request that the Court reject so much of the Probation Department's less-than-fully-informed analysis[1] as fails to find *any* factor(s) that would warrant a sentence outside of the advisory guideline system and embrace so much of the Government's serial pretrial plea offers as demonstrated its belief, some four months ago, that a time-served sentence for Mr. Zhuo satisfied the statutory purposes of sentencing.

A.  Background

  1. In The Absence Of Any Other Explanation For Them, The Government's Serial Plea Offers Of Time-Served Sentences Demonstrated Its Belief That A Below-Guidelines Sentence Is Sufficient To Satisfy The Statutory Purposes Of Sentencing.

  "More than 200 people have now been killed in a bombing campaign by the U.S. military against people it has accused of smuggling drugs in the waters off South America after a string of deadly attacks over the last week,"  Max Bearak and Jose Maria

---

[1] With a motion pending alleging due process violations of the statutory sentencing procedure, compliance with the Court's Scheduling Order should not be deemed a defense waiver of any current claims of procedural irregularity nor a waiver

Leon Cabrera, <u>The U.S. Boat Strike Campaign Has Now Killed Over 200 People</u>, NYTimes (May 31, 2026), yet the Government here offered someone it claims to believe is a drug transporter an inexplicably favorable plea.

 The government offered Mr. Zhuo a plea to misprision of a felony, in violation 18 U.S.C. § 4, in satisfaction of the indictment." February 11, 2026 Final Pretrial Conference ("FPC"), at 3-5.  Mr. Zhuo rejected it.  <u>Id</u>.  In an effort to address trial counsel's concerns that such a felony plea would invite immigration consequences, the government then offered Mr. Zhuo a plea to simple possession of 30 grams or less of marijuana, in violation of 21 U.S.C. § 844(a), a class A misdemeanor <u>Id</u>.  ("*So I just want to be clear and the record to be clear that we offered Mr. Zhuo a plea to an offense that would not result in his removal from the United States and is a misdemeanor that would result in time served*,")   Continuing to protest his actual innocence, as he had from the moment of his arrest, Mr. Zhuo rejected the plea.  <u>Id</u>. at 5 ("I didn't do anything but I was put in jail for 400 days. What I want is justice.")

 On February 18, 2026, at the conclusion of a constitutionally flawed two-day trial, the jury found Mr. Zhuo guilty of Count 2, possession with intent to distribute 50 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).  PSR, at ¶¶ 1-2. 16, 20.  As confirmed by both their decision to dismiss the conspiracy count, <u>id</u>. at ¶¶ 3-4, 26 n.3, and their subsequent opening, the Government acknowledged *ab initio* that Mr. Zhuo, a commercial driver, was unaware, when he set off on the 380-mile trip to New York to deliver it that the property he was to be paid less than $1000 to transport was marijuana. See T. 22

B.  <u>The Presentence Report and the Sentencing Recommendation</u>

 While there is no evidence that he ever knew the weight of the substance placed in his possession for all of thirty minutes, the Probation Office has selected a U.S.S.G. § 2D1.1 base offense level of 22, apparently on the premise that police subsequently determined that the seized substance summed 94 kilograms and Mr. Zhuo was convicted of possessing it.  PSR, at ¶¶ 27 (citing § 2D1.1(c)(9)).  Because he meets the criteria of U.S.S.G, § 4C1.1(a)(1)-(11), the Probation Office recommended that Mr. Zhuo receive a two-level Zero-Point Offender reduction. PSR, at ¶ 34. Thus, according to the Department's calculations, Mr. Zhuo's total offense level is 20 and, in the absence of any criminal history, his corresponding Category I guideline range is from 33-41 months of imprisonment. <u>Id</u>. at ¶¶ 35, 61

C.      Defendant's Factual Objections To The Presentence Report

With respect to Paragraph 48, which summarizes an interview with his ex-wife, Mr. Zhuo points out that her name is spelled "Minxing Zou" and his daughter's name is spelled "Selene."

Referring back to her statement, "Zou stated Zhuo was a 'very inexperienced driver' at the time of his arrest and he had received 'an *order* for an international Chinese' transport, Ms. Zou has explained that her subsequent statement, "As he began driving, he called a friend to ask about the *odor***,"** was innacurately transcribed. The word she used was "order", Mr. Zhuo called his friend to discuss the transport *order*.

With respect to Paragraph 47, the couple were married in August 2017 not August 2016.

D.      Defendant's Legal Objections To The Presentence Report

The Government conceded at trial that Mr. Zhuo did not become aware that he was transporting marijuana until he departed Frogtown Road. A review of the video demonstrates that CW-1 alone loaded all the boxes, containers, bags and luggage into Mr. Zhuo's minivan. The Government has no evidence that Mr. Zhuo opened any of them. Neither is there is any evidence that Mr. Zhuo was aware of how the substance within the boxes was packaged or what percentage of the gross weight of the boxes could be attributed to packaging. See PSR at ¶ 10 ("While at the station, USBP inventoried several boxes and bags containing a total of 210 packages of marijuana weighing a combined weight of approximately 245 pounds (approximately 111 kilograms) from Zhuo's vehicle. The parties have agreed that the net weight is 94 kilograms."). Because the Government has no evidence establishing that it is more likely than not that Mr. Zhuo knew that whatever was in the boxes weighed at least 60 kilograms much less 94, Mr. Zhuo objects to the Probation Office's selection of level 22 rather than level 18 or some lesser level as Mr. Zhuo's base offense level.

Mr. Zhuo therefore likewise objects to Probation's Paragraph 61 conclusion that the applicable guideline range is 33-41 months, its Paragraph 60 conclusion that the maximum term of imprisonment is 20 years pursuant to 21 U.S.C. § 841(b)(1)(C) governing offenses involving more than 50 kg of marijuana rather than 5 years pursuant § 841(b)(1)(D) for offenses involving less than 50 kg and its Paragraph 64 conclusion that the minimum term of supervised release is § 841(b)(1)(C)'s three years rather than (b)(1)(D)'s two years.

E. The § 3553(a) Factors Militate For A Bottom-Of-The- Guidelines Sentence

"The court should impose a sentence sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing.  U.S.S.G. Chapter 5, Part A, Introductory Commentary citing 18 U.S.C. § 3553(a).  In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." United States v. Singh, 877 F.3d 107, 121 (2017) (quoting Guido Calabresi, What Makes a Judge Great: To A. Leon Higginbotham, Jr., 142 U. Pa. L. Rev. 513, 513 (1993); see also Edward J. Devitt, Ten Commandments for the New Judge, 65 A.B.A. J. 574 (1979), reprinted in 82 F.R.D. 209, 209 (1979) ("Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases."). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Pepper v. United States, 562  U.S. 476, 487-88 (2011) (quoting Koon v. United States, 518 U.S. 81, 113 (1996)).

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

United States v. Gupta, 904 F. Supp. 2d 349, 350 (2012) (Rakoff, J.) (emphasis added). See also United States v. Adelson, 441 F. Supp. 2d 506, 509 (2006) (Rakoff, J.) ("As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.").

As set forth in the PSR at ¶¶ 44-59, his history and characteristics depict a highly industrious financially responsible 33-year-old college-educated lawful Chinese immigrant and father of one. Born three weeks after his arrest to a doctor who doesn't drive, Mr. Zhuo has never held his daughter.  Destined to be deported, it is possible that he never will.  His present misstep, if misstep it was, was wholly spontaneous and unprecedented in the context of an entirely law-abiding life.  PSR at ¶¶ 9, 44-46.  As demonstrated in the Letters in Support submitted pursuant to Local Rule 32.3, Mr. Zhuo is held in high regard by family and friends for his honesty, bravery, compassion, industry and devotion to family.

Having succumbed, according to the Government's strained theory, to the temptation to exploit the wholly unanticipated placement in his vehicle of a substance with which the evidence demonstrates he was entirely unfamiliar, Mr. Zhuo's "crime" was unplanned and, by all the available evidence, entirely uncharacteristic. The Government does not appear to have shared Mr. Zhuo's post arrest interview with the Probation Office.  To the defense' knowledge, the Court has not had occasion to listen to it.  In the belief that it is relevant to the Court's assessment of Mr. Zhuo's guilt, credibility and character and that, coupled with CW-1's proffer, it is what persuaded the Government to offer the favorable pleas, we ask that the Court listen to the interview.

Even if the Court's confidence in the Government is such that it accords no significance to its still--unexplained decisions to offer Mr. Zhuo plea terms the likes of which the Court has never encountered in its current career or authorized in its prior prosecutorial ones, even if the Court discredits Mr. Zhuo's wholly corroborated claims as unconvincingly self-serving and even if it is so unimpressed by his family's and friends' attestations of his lifelong personal probity that it persists in believing that, on ten minutes consideration, Mr. Zhuo did indeed decide to gamble away his future and his role in those of his daughter and her mother on the premise that boxes containing some unknown amount of marijuana of unknown quality that their owners had entrusted to a complete stranger would not only yield a life-changing financial windfall but that he was equipped to deal with whatever consequences the marijuana's owners would seek to inflict on the thief who stole it, in the constellation of federal felonies it is hard to construe Mr. Zhuo's actions as particularly serious.  See § 3553(a)(1).  See, generally, Weighing the Impact of Simple Possession of Marijuana: Trends and Sentencing in the Federal System United States Sentencing Commission at 6 (January 2023)  ("Recent legislative proposals have aimed to remove marijuana from the Controlled Substances Act schedules, eliminate criminal penalties for marijuana offenses, and expunge prior marijuana convictions); id. at 1  ( "the U.S. Department of Justice generally has treated marijuana *possession* offenses as a low enforcement priority in recent years") (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2023/20230110_Marijuana-Possession.pdf)

Of the 7 noncooperating first offenders with total offense levels of 20 sentenced between 2021 and 2025 pursuant to § 2D1.1 for possessing marijuana, the average length of imprisonment imposed was 20 month(s) and the median sentence was 21 month(s). PSR at 79.  Further, a quarter of the sentences imposed in cases with a §4C1.1 adjustment were downward variances with an average length of 19 months. https://www.ussc.gov/research/quick-facts/zero-point-individuals (last visited June 2, 2026)   18 % were sentenced to some alternative to incarceration.  Id.

E.    Because He Does Not Speak English, The Conditions of Mr. Zhuo's Pre-Trial Incarceration Have Been Unusually Isolating And Onerous And He Is Destined To Serve His Sentences Under Far Harsher Conditions Than In Typical Times.

In the belief that "it should not rise to the level of punishment" but often does, many courts have cited the severity of pretrial incarceration as justification for downwardly departing from a guidelines range. See United States v. Behr, 2006 WL 1586563 at 5 (S.D.N.Y. June 9, 2006) (citing Bell v. Wolfish, 441 U.S. 520, 537-38 (1979); United States v. Gallo, 653 F.Supp. 320, 336 (E.D.N.Y.1986) (noting that "[t]he inevitable consequences of pretrial incarceration, particularly when prolonged beyond a short period, are undeniably severe.").

Here, through no fault of Madison County Jail authorities but rather because he does not speak English and fate has denied him the social and psychological benefit of having Mandarin-speaking cohabitants, Mr. Zhuo has suffered through a particularly onerous pre- and post-trial detention. He has no one to talk to, doesn't understand instructions issued in English and, should he need anything from prison authorities, must struggle to make his requests understood. There are no Chinese language books, newspapers or television stations nor does he share cultural commonalities with other detainees, be they food, sports. Where he has already served half of Probation's recommended sentence in conditions akin to punitive isolation, the Court might consider a time-served term adequate punishment.

Neither can those harsh conditions be expected to improve going forward under an Administration that values ideology, obsequiousness, dollars, pulchritude - just about everything - over competence and for whom prisoners, save for favored fraudsters and insurrectionist fellow travelers, are hardly a priority. In the assessment of the GAO and DOJ OIG, the BOP "is experiencing an extreme shortage of correction officers, which poses a major safety and security risk to everyone in the system." Megan Gates, *A Cascading Crisis: U.S. Federal Prisons Grapple With Unsafe Understaffing,* Asisonline.org (March 16, 2026) (https://www.asisonline.org/security-management-magazine/articles/2026/03/corrections-security/unsafe-understaffing/) ; Drew Friedman, *House Democrats pressure BOP leadership on staffing crisis*, federalnewsnetwork (February 20, 2026)("A letter sent Friday to BOP Director William K. Marshall III from top Democrats on the House Judiciary Committee warned that workforce issues have reached a "crisis point," leading to operational challenges and unsafe conditions in the federal prison system.") (https://federalnewsnetwork.com/congress/2026/02/house-democrats-pressure-bureau-of-prisons-leadership-on-staffing-crisis/). See also Walter Pavlo, *Bureau Of Prisons Director William Marshall Addresses Challenges*, Forbes July 2, 2025 (In June 2025, a federal judge issued a preliminary injunction blocking the enforcement of a Trump executive order ending collective bargaining for BOP employees. Newly appointed Bureau of Prisons (BOP) Director William Marshall III inherited a BOP office in disarray and void of leadership. Two major issues facing the BOP have been its crumbling infrastructure and hiring to fill thousands of open positions.

Marshall said that the Agency is going to change for the better and there is always reluctance to any change. "Staff have to ask themselves, 'Is this where I want to be?'") https://www.forbes.com/sites/walterpavlo/2025/06/30/exclusive-interview-with-bureau-of-prisons-director-william-marshall/

Extrapolating from the way it has treated even the children of immigrants, there is every reason to believe that incarceration in Trump term two will fall little short of torture.  Prisoners can expect pandemic-like conditions with long program-less lockdowns, increased violence, neglect of medical needs, little family contact and high anxiety.  See, e.g., *Union Calls on Trump Administration to Reverse Pay Cuts for Federal Correctional Officers and Staff*, Prisonology (February 26, 2025) ("The Bureau of Prisons verbally notified employees across the country yesterday that it was reducing or eliminating the special recruitment and retention pay that has been paid to officers and staff at many federal facilities to help address dangerous understaffing levels. The retention pay adds between 10% and 25% to an employee's salary."  The American Federation of Government Employees says those "will exacerbate staffing shortages and make working conditions less safe."). Walter Pavlo, *The Bureau Of Prisons Under A Trump Administration*, Forbes, (Nov 06, 2024). (https://www.forbes.com/sites/walterpavlo/2024/11/06/the-bureau-of-prisons-under-a-trump-administration/); Shannon Heffernan, *How Trump Is Trying to Expand the Already Colossal U.S. Prison System,*  The Marshall Project (February 15, 2025) ("ICE has also begun sending some detainees to the federal Bureau of Prisons. But the BOP was already in crisis before Trump took office, as described by the Justice Department's Office of the Inspector General. The low ratio of staff to incarcerated people has left the BOP struggling to provide security and basic services to the people imprisoned in its facilities, putting their safety — and that of employees — at risk.")

In an attempt to compensate for that incipient systemic psychological stress and physical deprivation, a conscientious court might impose a lower sentence than it would have in less uncertain and turbulent times.  That prevailing conditions have already proved particularly hard on Mr. Zhuo might make the Court more comfortable imposing a time-served term.

F.  <u>Placement</u>

"[A] court may make a recommendation concerning the type of prison facility appropriate for the defendant; and in this calculus, the presence of a rehabilitation program may make one facility more appropriate than another." <u>United States v. Crum</u>, 843 Fed.Appx. 404, 2006 WL 1976165 (2d Cir. 2021)(citing <u>Tapia v. United States</u>, 564 U.S. at 334 (2011).   § 3621(b)(4)(B) does require the Bureau of Prisons ("BOP") to consider a district court's designation recommendation, among other factors, in discharging its responsibility for designating convicted federal defendants to appropriate penal facilities.

Because BOP nevertheless makes every effort to respect a district court's recommendations, should it decide that further incarceration is warranted, Mr. Zhuo

requests that the Court recommend placement in BOP's Northeast Region, near his daughter and her mother.  See 18 U.S.C. § 3621 (b)(4)(B); Bureau of Prisons Program Statements PS 5140.28 and PS 5070.10 § 7 (a) & (b); United States v. Potoski, 2010 WL 1909551 (09-0176-cr 2d Cir. May 13, 2010) (sentencing court may recommend place of imprisonment) (citing United States v. Yousef, 327 F3d 56, 165 (2d Cir. 2003)); Woodall v. Federal Bureau of Prisons, 432 F.3d 235 (3d Cir. 2005) (same).


G.      Conclusion

        Where neither the statutory purposes of sentencing nor justice in general would be well served by further incarceration, the Court should sentence Mr. Zhuo as suggested herein to a variant time-served term.



                        Respectfully submitted,



                        _____
                        Patrick J. Brackley (PJB 6808)



cc: AUSA Douglas Collyer